### DERMAN v. STOR–AID, Inc., et al.

### STOR–AID OF NEW JERSEY v. DECORATIVE CABINET CORPORATION et al.

### STOR–AID OF ILLINOIS, Inc., v. SAME.

Nos. 292–294.

Circuit Court of Appeals, Second Circuit.
March 23, 1944.

---

[11] Section 9 of the Act of May 14, 1930, supra.

W. Lee Helms, of New York City, for appellants.

Aaron L. Danzig, of New York City, for appellees.

Before L. HAND, SWAN, and AUGUSTUS N. HAND, Circuit Judges.

L. HAND, Circuit Judge.

The defendant appeals from one, and the plaintiffs appeal from two judgments of the District Court. The first was in an action for patent infringement and held valid and infringed, claims eleven, thirteen and fourteen of Patent No. 1,933,099, issued to the plaintiff, Harry Derman, on October 31, 1933; and dismissed a counterclaim for unfair competition because of his abuse of the patent in suit and ten other patents issued to him. The other two judgments were in actions brought by subsidiaries of defendant in the first ac-

tion—Stor-Aid, Inc.—against companies controlled by Derman, and dismissed complaints for unfair competition, similar to the counterclaim in the first action. The principal issue in the litigation is the validity of the claims in suit of Derman's patent. Its specifications disclose a collapsible box or case which can be used as a chest—or, when stood on end, as a wardrobe—made of cardboard or the like, cheap, easily set up and made as follows. A rectangular strip of the specified material, longer than its width, is scored across its shorter axis at three different places and then folded upon the scored lines so as to form the bottom, front and back walls and cover of the chest, making, when the cover is closed, a parallelogram with open ends. The ends are closed by two square pieces of the same material, to the inside surface of which along all four edges is glued or otherwise fastened a wooden frame. This frame has slots on three of its lengths, into which fit the edges of the bottom and front and back walls of the chest, and which hold them in place by glue, upholstery tacks, or the like. This makes a solid box with a cover, hinged upon the third fold, having a flap, frictionally held by the upper edge of the front wall. Derman shipped this chest or wardrobe in a collapsed state so as to be easily transported, and sold it at wholesale for about a dollar. Sales began early in 1933, and immediately began to grow with enormous rapidity: during the following eight years twenty-five or thirty million units have been sold. Blechman, one of the defendants, at first took out a license under the patent for a company of which he was president, and which continued to manufacture under the license for nearly ten years, paying Derman over $175,000 in royalties. But in August, 1941, Blechman apparently concluded that the patent was invalid, resigned from the company which had taken the license, and formed another, the defendant, Stor-Aid, Inc., which thereupon began frankly to infringe the claims in suit. Thus, the only question as to the complaint in the first action is of validity.

Many years before Derman's filing date —January 13, 1933—the art had been familiar with boxes made of three pieces of cardboard, pasteboard, or the like: one piece, folded along two or three scored lines, so as to form a box, open at the ends, and two square pieces to close the openings. The earliest of these are Manneck,

No. 111,463, which issued January 31, 1871. The bottom, front and back walls were made of a single piece of pasteboard folded in only two places, for it had no cover; the square ends were of the same material with flanges turned in on three sides, which slipped inside the bottom and front and back walls—instead of embracing them like Derman's—and which were held in place by metallic clamps. Green, in 1896, No. 573,782, disclosed a similar construction except that the end pieces were framed with wood, and that the box had a cover with a flap like Derman's. We need not discuss any other references except Hofman, No. 1,270,294, issued June 25, 1918; and Friedel, No. 1,523,639, issued January 20, 1925. The first of these was for a cardboard "shipping box" whose bottom, front and back walls, and cover (a double flap), were of a single piece of cardboard scored in four lines, along which it was bent to form a parallelogram. The end pieces did not, it is true, have any frames into whose grooves the edges of the bottom and front and back walls fitted; but the edges of the end walls were bent into flanges at right angles, and then doubled back on themselves through 180 degrees, thus making channels or grooves, and into these the bottom and front and back walls slipped. Thus, the end pieces embraced the edges of the bottom and front and back walls by means similar in function to the slots in Derman's "frames." The result of this construction was that the surfaces of the end pieces were set a little inside the main body of the box, instead of being flush as in Derman. Friedel's disclosure was of a wardrobe proper, which stood on its end. The three upright sides, and two "stiles" for a door, were made of a single piece of scored and folded cardboard, or the like. The end pieces—top and bottom—were of the same material, and flanged; the flanges at the bottom being turned down, and those at the top, turned up. These flanges fitted into grooves in wooden frames which ran around the edges of the end pieces, and were secured in them. In setting up this wardrobe, the edges of the upright sides were fitted into the same grooves alongside of the flanges of the end pieces; and from this it resulted that, as in Hofman, the end pieces were set a little inside the edges of the bottom and front and back walls. Friedel's door was a very complicated affair, with "stiles," a lintel, a sill; it was alto-gether unlike Derman's. Friedel also provided a number of reinforcing pieces of wood inside and around his wardrobe, making an expensive, cumbersome and inconvenient construction as a whole, although it went upon the market and had a limited success. It will have been observed, however, that the frames embraced the edges of the bottom and front and back walls, like Derman's "frames," though they were not fastened to the inner surfaces of the end walls along their edges.

Of the claims in suit claim eleven is for a box, case, chest or wardrobe made of cardboard or the like in which the bottom and front and back walls are in one piece, so hinged that they can be collapsed; and in which the two end walls are "provided with peripheral means" which "engage" the edges of the bottom and front and back walls. "Peripheral," although nowhere defined in the specifications, can only mean that the end walls embrace the edges of the bottom and front and back walls, unlike Manneck and Green, in which the end walls slip within them. Claim thirteen is in the same words as claim eleven, but adds the "frames" as part of the "peripheral means," and the cover hinged to the back wall at its scored edge and carrying the flap which the front wall holds frictionally when the cover is closed. Claim fourteen is the same as thirteen, except that it adds a member running along the inside of the top edge of the front wall to cooperate with the cover to hold it shut. It was one of those trivial variants which for some inexplicable reason it seems impossible for an examiner to resist, but which add nothing to the claim. For this reason we shall disregard it, and confine our discussion to claims eleven and thirteen. Claim eleven reads upon Friedel and Hofman without exception. Since "frames" are added in claims thirteen and fourteen, and indeed in other claims, this claim must be read to exclude them. Both Hofman and Friedel have "peripheral means"; i.e. the end walls embrace the bottom and front and back walls; Hofman, by means of the channels made by twice folding the edges of the end walls; Friedel, by the slots in the "frames." It is true that, as we have said, the end walls in each are set a little within the edges of the bottom and front and back walls, unlike Derman where the end walls are flush; but the claims contain no such limitation, and it would not be a patentable

variation anyway. The plaintiff seeks to distinguish Hofman as in a "non-analogous art"; but plainly that is not true. Derman's disclosure was for any kind of "container," made up according to his directions; a wardrobe was merely one form. He speaks of "boxes," "cases" and "chests" interchangeably with "wardrobes," and the claims in suit apply to all equally. To confine them to wardrobes would be to reissue the claims, and that too without the slightest warrant in the specification. Hence, any prior disclosure of a box or "shipping case," like Hofman, is a good reference. Hofman is not, however, a good reference against claim thirteen for two reasons; because it had no "frames," and because Hofman's flaps were not, strictly speaking, a single cover and because neither carried a tab at the end to hold it down. Friedel on the other hand had "frames," but his cover—door—was altogether different. Also, Friedel's "frames" were, as we have said, not fastened to the inside surface of the end walls, although, as in the case of claim eleven, that is not important. Any "frames" which are "peripheral" infringe. Moreover, as to the frictional tab on the end of the cover, Green is a complete anticipation, provided any anticipation is necessary for such a trifle.

Thus the case comes down to whether it required invention to combine Friedel's "frames" with Green's cover, or Hofman's double flaps, abandoning Friedel's door. Derman, as is usual in such cases, points to the long interval between the appearance of Friedel's and his patent, to Friedel's very modest sales, and to his own extraordinary and outstanding success. That reasoning has won many an action; nevertheless, it cannot be safely used without careful analysis, for it must always be remembered that the monopoly resides in the claims and the claims depend upon the combination of elements which they prescribe. An article may have an extraordinary success and may indeed be an invention of high merit, and yet that success and that invention may have nothing whatever to do with the combination described in the claims, but may depend upon elements, which, though added to those of the prior art, the patentee did not introduce in his claims, and perhaps could not have introduced. Although there is no better test than history, when used with proper circumspection, it is never safe to accept success alone as the measure of invention. What Derman really did, and what he owed his success to, was to reorganize Friedel's wardrobe generally. We do not mean that he did this deliberately; but it would have made no difference if he had, for his work must be judged as though it had been before him. All that can be credited to him is making over Friedel by throwing away the inner reinforcing struts or supports and other unnecessary complications, by fastening the "frames" to the inside of the end walls, and by substituting Green's or Hofman's cover for Friedel's door with its ancillary parts. So far as he improved upon Friedel in any other way than by the last of these, he dedicated whatever he did to the public, for he did not get it into his claims. Conceding that he made a cheap, durable wardrobe, easily knocked down, shipped, and set up, in place of Friedel's cumbersome, expensive wardrobe, hard to take down, to ship, and to set up: that is all irrelevant, if Friedel's wardrobe already disclosed, hampered by no matter how much unnecessary complication, all the elements of the only claims that Derman succeeded in securing; always provided that Friedel's embodiment of the patented combination was practicable, as in fact it was.

■ There remains the fact that claim thirteen does specify Green's cover, and that Derman is to be credited with whatever ingenuity was necessary to think of substituting it for Friedel's door. On its face, when one was engaged in simplifying and cheapening Friedel's disclosure, that substitution would seem to have been an obvious expedient. To suppose that the art waited for the eight years which elapsed between the issue of Friedel's patent and the filing of Derman's application for this happy thought would be romance. If Derman had merely substituted Green's door upon Friedel's disclosure as it stood, no one will maintain that it would have caught the public fancy, as it did, it would have remained what it was, heavy, expensive, awkward to set up, hard to knock down, cumbersome to ship. It was not the door that made it a success, but the general organization of the whole article; and we may concede for argument, that it took insight out of the common to see what could be stripped away and leave the substance of the invention unimpaired. But that does not change the fact that Friedel had all

along embodied all but one of the elements of the claims. We hold claims eleven, thirteen and fourteen invalid for lack of invention, and dismiss the complaint in action 17-347.

 The counterclaim in that action charged that Derman "knowingly brought" suit against the defendants "without basis and for the purpose of damaging" their business, and that he and the Decorative Cabinet Corporation—one of the defendants in the two other actions—"furthered" this unlawful purpose "by oral representations to the trade that defendants infringed patents controlled by Harry Derman and that members of the trade * * * would be subject to suit," and "by written representations * * * that suit had been brought * * * against the defendant Stor-Aid, Inc." The evidence in support of this is two advertisements broadcast to the trade, and the fact that Derman originally sued on eleven patents, by amendment reduced these to five—of which he abandoned one—and finally failed to recover on three of the remaining four. He is a citizen of New York; Stor-Aid, Inc. is a New York corporation; Blechman's citizenship does not appear; hence the district court had no jurisdiction, based upon diversity of citizenship; nor did the cause of action arise out of any law of the United States. If the court had any jurisdiction whatever, it was under the doctrine of Hurn v. Oursler, 289 U.S. 238, 53 S.Ct. 586, 77 L.Ed. 1148. We have very recently discussed this question in an appeal closely similar to that now before us (Zalkind v. Scheinman, 139 F.2d 895), and we can see no valid distinction between that case and this. In each the alleged liability arose from unlawful dealing with an alleged invention: in that case, by unconscionably delaying the prosecution of an application for a patent; in this, by threatening suit upon patents known to be invalid. For the reasons stated at length in that opinion, we dismiss the counterclaim in action 17-347, because it was not within the jurisdiction of the district court.

 The other two actions (17-450 and 18-52), were brought by two foreign corporations—organized in New Jersey and Illinois respectively—against two New York corporations, and the district court therefore had jurisdiction because of the diversity of citizenship. The complaints are the same: i.e. that Derman was the president of both the defendant companies and directed their "policies and management"; that he had licensed them under the eleven patents sued upon in the first complaint; that the defendants had employed salesmen who acted under his direction; that these salesmen, with Derman's knowledge that the plaintiff's wardrobes "were free from infringement of said patent of Harry Derman," made oral representations to the trade that the plaintiff's products infringed the aforesaid patents; and that in making these representations the salesmen "were acting within the scope of their employment by the defendant corporations and with the knowledge of the President of each corporation, and under his direction or consent." We can find no evidence connecting the two New York corporations with any assertion of the patents against the plaintiffs; or with the offending advertisements. Derman did swear that he supervised and directed the salesmen's activities, but he denied that he told them what to say to the trade. Besides, there is no evidence of what the salesmen did in fact say, and the advertisements relied upon (Exhibit L and Exhibit O) both spoke in the name of Derman, although the names of the two New York companies appeared as licensees on the bottom of Exhibit L. The companies were not liable merely because Derman was their president, and in general control of them; the plaintiffs were bound at least to prove that he undertook to act for them. Maybe he did, but that nowhere appears. The judgments in action 17-450 and action 18-52 will be affirmed.

In action 17-347 the judgment will be reversed in toto: judgment will be entered dismissing the complaint upon the merits, and dismissing the counterclaim for lack of jurisdiction in the district court. Costs to the defendants.

In action 17-450 and action 18-52 the judgments will be affirmed with costs.